**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BRENDA ANN O'BRYAN,** | : | **Civil No.  1:21-CV-1911** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI**, | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

## I.    Introduction

Brenda O'Bryan was 57 years old and was a worker of advanced age at the time of the alleged onset of her disability. Ms. O'Bryan—who alleged that she had become disabled in November of 2017 as a result of degenerative disc disease, bilateral knee osteoarthritis status post bilateral arthroscopies, osteoporosis and a stroke or cerebrovascular accident—also had an extensive and extensively documented history of migraine headaches. In fact, O'Bryan's treating physician, the only physician who actually examined her and opined upon her medical condition concluded that these migraines were disabling in that they would compel frequent workplace absences, and multiple unscheduled breaks for the plaintiff.

1

Notwithstanding this evidence, the Administrative Law Judge ("ALJ") who heard O'Bryan's case denied this disability claim in a cursory decision, finding that O'Bryan could perform light work. In reaching this result, the ALJ entirely discounted O'Bryan's chronic migraines at Step 2 of the sequential analysis that applies in disability cases, concluding that her migraines did not even meet the minimal threshold of a severe impairment.  The ALJ then found the opinion of a non-examining source more persuasive than the views expressed by O'Bryan's treating physician even though this non-treating, non-examining source acknowledged that O'Bryan suffered "chronic daily headache[s]" but never thoroughly evaluated the severity of O'Bryan's chronic migraines.

Thus, we are presented with a case in which a well-documented impairment, O'Bryan's migraine headaches, was summarily discounted at Step 2 of the disability assessment as a nonsevere impairment and then received only scant attention throughout the sequential analysis of the plaintiff's claim. For ALJs, Social Security disability determinations frequently entail an informed assessment of competing medical opinions coupled with an evaluation of a claimant's subjective complaints. Once the ALJ completes this task, on appeal it is the duty and responsibility of the district court to review these ALJ findings. However, in order to pass legal muster, it is axiomatic that the ALJ's decision must be accompanied by "a clear and

satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981).

While we regard this as a close issue, in the instant case we conclude that the ALJ's assessment of this evidence does not satisfy the burden of articulation mandated by law. The decision to summarily discount O'Bryan's migraines as a nonsevere impairment coupled with the scant attention this impairment received throughout the disability analysis process, in our view does not satisfy the ALJ's duty of articulation in this case. Accordingly, we will remand this case for further consideration by the Commissioner.

II.   <u>**Statement of Facts**</u>

On February 25, 2020, Brenda O'Bryan applied for benefits pursuant to Title II of the Social Security Act, alleging a date of onset of disability beginning on July 1, 2012. (Tr. 15). O'Bryan later amended the date of onset of her disability to November 2017. (<u>Id</u>.) O'Bryan was born in 1960 and was 57 years old at the time of the alleged onset of her disability, making her an individual of advanced age under the Commissioner's regulations. (Tr. 23). O'Bryan had prior employment as a department manager, skilled work undertaken at a medium exertional level. (<u>Id</u>.)

O'Bryan's disability application was based upon an array of chronic and acute medical impairments, including degenerative disc disease, bilateral knee

osteoarthritis status post bilateral arthroscopies, osteoporosis, and a stroke or cerebrovascular accident. (Tr. 17). In addition, O'Bryan cited another significant and chronic medical impairment, migraine headaches, as a disabling impairment.

O'Bryan's chronic migraines, coupled with a stroke that she suffered in November of 2017, were a central element of this disability claim. Indeed, in her disability hearing testimony and her adult function report O'Bryan named her migraines as one of the principal medical impairments that she experienced. (Tr. 35, 222). According to O'Bryan, following her stroke she would suffer from migraines twelve to eighteen times a month, was unable to function as a result, and would have to take numerous, unscheduled breaks during the day to lie down and rest. (Tr. 42-44). While O'Bryan testified in March of 2021 that her migraines had improved, she still acknowledged experiencing three to six severe migraines each month. (Tr. 44).

With respect to these migraine headaches, it is undisputed that O'Bryan had an extensive and extensively documented history of suffering from migraines. This medical history reached back to 2012, the original date of onset of disability cited by O'Bryan. As early as July of 2012, O'Bryan was being treated by Dr. Emile Roy for chronic migraines which she was experiencing three times each week. (Tr. 916). Between July 2012, and August 2020, O'Bryan's treatment records were replete with references to her chronic migraines.  Indeed, on more than twenty occasions

4

over this eight-year period, Dr. Roy diagnosed O'Bryan as suffering from migraine headaches.[1]

The severity and frequency of these chronic migraines appears to have varied and fluctuated over time. Oftentimes the migraine headaches were described as weekly events, occurring on several occasions each week. (Tr. 897, 916, 976-77, 980-81). Treatment notes also described at least one acute migraine flare, (Tr. 888), and reported on one occasion in March of 2018 that O'Bryan suffered from a "constant" headache. (Tr. 366). It was also reported that during migraine episodes, O'Bryan would suffer from headaches, nausea, and light sensitivity. (Tr. 902). Yet, on other occasions the migraines were characterized as either intermittent or stable. (Tr. 861, 864, 867, 876, 878, 880, 885). One other recurrent aspect of O'Bryan's migraines was a frequently noted connection between the frequency and severity of her symptoms, and the stress she was experiencing in her life.  Thus, Dr. Roy often described O'Bryan's migraines as chronic and stress related. (Tr. 867, 894,  905, 910, 976-77, 980-81, 985).

Dr. Roy—the only opining physician to treat O'Bryan or examine her—also provided a physical capacity evaluation assessing the degree to which these chronic

---

[1] Tr. 366, 861, 864, 867, 878, 880, 885, 891, 894, 897, 902, 905, 908, 910, 915, 916, 967-68, 976-77, 980-81, 985.

migraines were disabling. On February 5, 2021, Dr. Roy explained that O'Bryan's migraine headaches were unpredictable, but on average occurred more than seven times each month. (Tr. 991). According to Dr. Roy, the frequency of the migraines increased when O'Bryan was under stress and could last for many hours. (Id.) During these episodes O'Bryan would suffer from headaches, fatigue, and sensitivity to light and sound. (Id.) When she suffered from a migraine, Dr. Roy stated that O'Bryan would need to rest for hours. (Id.) Therefore, the doctor opined that she would require frequent unscheduled breaks and would miss three or more days of work each month due to her migraines. (Id.) Moreover, Dr. Roy—the only physician who had examined and treated O'Bryan throughout this time period—also stated that her impairments related back to December of 2017, her date last insured under the Social Security Act. (Id.)

While the non-treating, non-examining state agency doctors who considered O'Bryan's case in May and November of 2020 opined that she could perform some work, they appeared to agree that O'Bryan's chronic migraines were a significant impairment. Thus, on May 29, 2020, Dr. John Bertolino, a state agency expert, observed that "[n]otably, [O'Bryan] had continued to have chronic daily headaches," (Tr. 62), a finding which was echoed by a second state agency expert, Dr. Robert Warner, on November 10, 2020. (Tr. 76).

Thus, the medical record in this case clearly established that O'Bryan's migraines were a universally recognized, chronic, and persistent medical condition. Further, the only doctor who had actually treated O'Bryan opined that these migraines, standing alone, were disabling in their severity.

Based upon this medical record, an ALJ conducted a hearing on O'Bryan's disability claim on March 19, 2021. (Tr. 29-56). During this hearing, O'Bryan and a vocational expert appeared and testified. (Id.) In her testimony, O'Bryan emphasized that her chronic migraines were a major contributing factor in her disability claim. (Tr. 35). Consistent with Dr. Roy's medical opinion, O'Bryan stated that following her stroke in November of 2017 she would suffer from migraines twelve to eighteen times a month, was unable to function as a result, and would have to take numerous, unscheduled breaks during the day to lie down and rest. (Tr. 42-44). While O'Bryan testified in March of 2021 that her migraines had improved, she still acknowledged experiencing three to six severe migraines each month. (Tr. 44).

Following this hearing, on April 5, 2021, the ALJ issued a decision denying O'Bryan's application for benefits. (Tr. 12-24). In this decision the ALJ identified O'Bryan's date of onset of her disability as November 2017, when she suffered her stroke. (Tr. 15). The ALJ then found that O'Bryan met the insured requirements of the Act through December 31, 2017 and had not engaged in substantial gainful

7

activity since July 1, 2012. (Tr. 17). At Step 2 of the sequential analysis, which governs disability claims, the ALJ determined that O'Bryan's degenerative disc disease, bilateral knee osteoarthritis status post bilateral arthroscopies, osteoporosis, and a cerebrovascular accident or stroke, were all severe impairments. (Tr. 17).

This Step 2 analysis was curious, however, in several respects. Most notably, the ALJ rejected the claim that O'Bryan's migraines were also a severe impairment. (Tr. 17). Instead, relying upon several isolated treatment notations, many of which related to treatment after O'Bryan's date last insured, the ALJ summarily concluded that "this impairment is nonsevere in that it does not cause more than a minimal limitation in the ability to perform basic work activities." (Tr. 18).

In reaching this conclusion at Step 2 the ALJ seemingly discounted the sole treating source opinion on record, Dr. Roy's medical statement which opined that O'Bryan's migraines were completely disabling given their frequency, unpredictability, and severity. In fact, the Step 2 analysis gave no consideration whatsoever to this medical opinion which was supported by eight years of clinical treatment records. The ALJ's Step 2 evaluation of these migraines also made no mention of the fact that the state agency experts all agreed that "[n]otably, [O'Bryan] had continued to have chronic daily headaches." (Tr. 62, 76). Thus, the ALJ's

8

decision to discount O'Bryan's migraines as a nonsevere condition ignored a medical professional consensus that they were a significant medical impairment.

At Step 3, the ALJ determined that none of O'Bryan's medical impairments met the severity of a listed impairment under the Commissioner's regulations. (Tr. 19). Between Step 3 and 4, the ALJ then crafted the following residual functional capacity assessment for O'Bryan:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she is able frequently to climb ramps and stairs, kneel, crouch and crawl with no climbing of ladders or scaffolds. She is able to tolerate occasional exposure to fumes, odors, dusts, pulmonary irritants, extreme cold and heat, and vibrations. She is able to tolerate moderate noise, and have no exposure to unprotected heights and moving machinery.

(Tr. 19).

In reaching this RFC, the ALJ paid scant attention to O'Bryan's extensively documented history of migraines which had been acknowledged by every doctor who considered her disability claim. Indeed, the only reference to this impairment was the ALJ's summary conclusion that Dr. Roy's treating source opinion was not persuasive. (Tr. 22). Thus, once the ALJ discounted O'Bryan's history of migraines as nonsevere at Step 2 of this analysis, this well-documented and universally

9

recognized impairment seemed to have played no appreciable role in the disability analysis of this case.

Having reached these conclusions, the ALJ concluded that O'Bryan could not perform her past work, (Tr. 22), but found that this worker of advanced age could still perform a range of light work and concluded that she was not disabled. (Tr. 23-24).

This appeal followed. (Doc. 1). On appeal, O'Bryan argues that the ALJ's Step 2 analysis was flawed in that it did not consider the disabling effects of her migraines, and this significant medical condition—which was discounted at Step 2—did not receive adequate consideration throughout the ALJ's sequential evaluation of this claim. As discussed below, we conclude that the ALJ's Step 2 evaluation and the assessment of the medical opinion evidence does not satisfy the burden of articulation mandated by law. Therefore, we cannot conclude that substantial evidence supports the ALJ's decision in this case. Accordingly, we will remand this case for further consideration by the Commissioner.

III. **Discussion**

A. **Substantial Evidence Review – the Role of this Court**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the

findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is

11

supported by substantial evidence and was reached based upon a correct application of the relevant law.  See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc.

Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted

on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for
> his decision. 220 F.3d at 119. Conclusory statements . . . are
> insufficient. The ALJ must provide a "discussion of the evidence" and
> an "explanation of reasoning" for his conclusion sufficient to enable
> meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d
> 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
> particular "magic" words: "<u>Burnett</u> does not require the ALJ to use
> particular language or adhere to a particular format in conducting his
> analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the

ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is

sufficiently articulated to permit meaningful judicial review.

### B.    <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive benefits under the Title II of the Social Security Act by reason of

disability, a claimant must demonstrate an inability to "engage in any substantial

gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §§404.1505(a),

416.905(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.  42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.   20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able

to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).   In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11

15

(3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir.

16

2006); Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

### C.   Step 2 Analysis

Step 2 of this sequential analysis is often the first substantive benchmark an ALJ must address and is governed by familiar legal standards:

> With respect to this threshold showing of a severe impairment, the showing required by law has been aptly described in the following terms: "In order to meet the step two severity test, an impairment need only cause a slight abnormality that has no more than a minimal effect on the ability to do basic work activities. 20 C.F.R. §§ 404.1521, 416.921; S.S.R. 96–3p, 85–28. The Third Circuit Court of Appeals has held that the step two severity inquiry is a *'de minimus* screening device to dispose of groundless claims.' McCrea v. Comm. of Soc. Sec.,370

18

F.3d 357, 360 (3d Cir.2004); <u>Newell v. Comm. of Soc. Sec.</u>, 347 F.3d 541, 546 (3d Cir.2003). 'Any doubt as to whether this showing has been made is to be resolved in favor of the applicant.' <u>Id.</u>" <u>Velazquez v. Astrue</u>, No. 07–5343, 2008 WL 4589831, *3 (E.D.Pa., Oct.15, 2008). Thus, "[t]he claimant's burden at step two is 'not an exacting one.' <u>McCrea v. Comm'r of Soc. Sec.</u>, 370 F.3d 357, 360 (3d Cir.2004). This step should be 'rarely utilized' to deny benefits. <u>Id.</u> at 361. Rather, ... [a]n individual should be denied benefits at step two only if the impairment he presents is a 'slight abnormality' that has 'no more than a minimal effect on [his] ability to work.' <u>Id.</u>" <u>Kinney v. Comm'r of Soc. Sec.</u>, 244 F. App'x 467, 469–70 (3d Cir.2007). Accordingly, "[d]ue to this limited function, the Commissioner's determination to deny an applicant's request for benefits at step two should be reviewed with close scrutiny." <u>McCrea v. Commissioner of Social Sec.</u>, 370 F.3d 357, 360 (3d Cir.2004).

<u>Dotzel v. Astrue</u>, No. 1:12-CV-1281, 2014 WL 1612508, at *4 (M.D. Pa. Apr. 22, 2014). Furthermore,

> [E]ven if an ALJ erroneously determines at step two that one impairment is not "severe," the ALJ's ultimate decision may still be based on substantial evidence if the ALJ considered the effects of that impairment at steps three through five. However, where it appears that the ALJ's error at step two also influenced the ALJ's RFC analysis, the reviewing court may remand the matter to the Commissioner for further consideration. <u>See Nosse v. Astrue</u>, No. 08–[CV–1173, 2009 WL 2986612, *10] (W.D.Pa. Sept.17, 2009).

<u>McClease v. Comm. of Soc. Sec.</u>, No. 8–CV–1673, 2009 WL 3497775, *10 (E.D. Pa. Oct. 28, 2009); <u>see also Salles v. Comm. of Soc. Sec.</u>, 229 Fed. App'x 140, 145, n. 2 (3d Cir. 2007) (citing <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 553 (3d Cir. 2005) ("Because the ALJ found in Salles's favor at Step Two, even if he had erroneously concluded that some of her impairments were non-severe, any error was harmless.").

Stouchko v. Comm'r of Soc. Sec., No. 1:12-CV-1318, 2014 WL 888513, at *10 (M.D. Pa. Mar. 6, 2014). Simply put, "because step two is to be rarely utilized as basis for the denial of benefits, [] its invocation is certain to raise a judicial eyebrow." McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 361 (3d Cir. 2004) (citing SSR 85–28, 1995 WL 56856, at *4 ('Great care should be exercised in applying the not severe impairment concept')).

### D.   This Case Will Be Remanded for Further Consideration and Articulation of the Grounds for the ALJ's Decision.

As we have noted, it is axiomatic that an ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. Furthermore, the ALJ must also "indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck, 181 F.3d at 433. Moreover, "because step two is to be rarely utilized as basis for the denial of benefits, [] its invocation is certain to raise a judicial eyebrow." McCrea, 370 F.3d at 361.

Judged by these legal benchmarks we conclude that there are a series of ambiguities in the ALJ's decision which, in combination, compel a remand of this case. Initially, we believe that the ALJ's Step 2 analysis is incomplete and inadequate and is flawed in several ways.

First, the ALJ's analysis was marked by legal error since the ALJ's Step 2 assessment of O'Bryan's migraines ignored several basic legal tenets governing this stage in the disability evaluation process. It is axiomatic that at Step 2 "an applicant need only demonstrate something beyond 'a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work.' " McCrea, 370 F.3d at 360. On this score "[a]ny doubt as to whether this showing has been made is to be resolved in favor of the applicant." Id. "In short, '[t]he step-two inquiry is a *de minimis* screening device to dispose of groundless claims.' " Id. Plainly, the ALJ's Step 2 evaluation of O'Bryan's longstanding, well-documented migraines went far beyond a *de minimis* screening. This was error.

More fundamentally, when viewed through the proper legal lens this Step 2 assessment was simply wrong as a factual matter. Every medical source who opined in this case recognized O'Bryan's migraines as a significant impairment. Indeed, Dr. Roy, O'Bryan's treating physician and the only doctor with an actual longitudinal history with O'Bryan, asserted that these migraines, standing alone, were disabling. Further, the state agency experts that were deemed persuasive all agreed that "[n]otably, [O'Bryan] had continued to have chronic daily headaches." (Tr. 62, 76). Yet, the ALJ's decision rejected this medical consensus at Step 2 without even

addressing or acknowledging the fact that all of the physicians who considered this case deemed these migraines to be a significant impairment. This was a failure of articulation.

Additionally, the clinical evidence when viewed under the proper legal standard fully supported a finding that O'Bryan's migraines were a serious impairment. Between July 2012, and August 2020, O'Bryan's treatment records were replete with references to her chronic migraines and on more than twenty occasions over this eight year period, Dr. Roy diagnosed O'Bryan as suffering from chronic migraine headaches.[2] While the severity and frequency of these chronic migraines appears to have varied and fluctuated over time, the migraine headaches were often described as weekly events, occurring on several occasions each week. (Tr. 897, 916, 976-77, 980-81). Treatment notes also described at least one acute migraine flare, (Tr. 888). It was reported on one occasion in March of 2018 that O'Bryan suffered from a "constant" headache, (Tr. 366), and documented that during migraine episodes O'Bryan would suffer from headaches, nausea, and light sensitivity. (Tr. 902). Moreover, another recurrent aspect of O'Bryan's migraines was a frequently noted connection between the frequency and severity of her

---

[2] Tr. 366, 861, 864, 867, 878, 880, 885, 891, 894, 897, 902, 905, 908, 910, 915, 916, 967-68, 976-77, 980-81, 985.

symptoms, and the stress she was experiencing in her life.  (Tr. 867, 894, 905, 910, 976-77, 980-81, 985). This clinical and opinion evidence more than satisfied Step 2's *de minimis* threshold for deeming an impairment severe.

Thus, we find that the ALJ committed a Step 2 error in the evaluation of the severity of O'Bryan's migraine headaches. While such errors can be cured if the ALJ thoroughly considers the nonsevere impairment at all subsequent steps in the disability analysis process, such curative measures were not taken by the ALJ in this case. Quite the contrary, once O'Bryan's migraines were discounted at the outset of this analysis, they received scant attention from the ALJ throughout the analytical process. This, too, was error.

Further, this flawed Step 2 analysis and incomplete medical opinion evaluation may have had even greater significance and potential prejudice due to the fact that it is undisputed that O'Bryan was born on January 28, 1960 and was 57 years old, which is defined as an individual of advanced age, on the date last insured. Further, during the pendency of these proceedings O'Bryan's age category changed to closely approaching retirement age. (Tr. 23). Social Security regulations have long recognized that, as we age, our ability to transition to new employment diminishes. See generally 20 C.F.R., Part 404, Subpart P, Appendix 2. Therefore, the prejudice

which flowed from this uncorrected Step 2 error is compounded in this case, where due to her advanced age O'Bryan's employability was already significantly eroded. Thus, resolution of these inconsistencies could change the outcome of this case if the ALJ found that O'Bryan's migraines were a severe impairment that further reduced her ability to maintain employment. In this case, since the ALJ's assessment of this aged worker's residual functional capacity is marked by these internal inconsistencies, and a further evaluation could materially alter this disability calculus, a remand of this case is required to clarify this question.

Finally, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

## IV.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, IT IS ORDERED that this case be REMANDED for further consideration of the Plaintiff's application.

An appropriate order follows.

<u>/s/ Martin C. Carlson</u>
Martin C. Carlson
United States Magistrate Judge

DATED: January 4, 2023